The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Cramer, the briefs on appeal and arguments of counsel. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives or amend the Opinion and Award. Accordingly, the Opinion and Award by Deputy Commissioner Kim L. Cramer is affirmed.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act, and the employer-employee relationship existed between the plaintiff and defendant PPG Industries, Inc. on March 9, 1993.
2. Plaintiff sustained an admittedly compensable injury by accident in the course of her employment with defendant on or about March 9, 1993. However, the parties disagree as to the extent of any resulting injuries and disability.
3. As of March 9, 1993, plaintiff's average weekly wage was $476.82.
* * * * * * * * * * *
The Full Commission adopts the Findings of Fact found by the Deputy Commissioner, as follows:
FINDINGS OF FACT
1. As of the hearing date before the Deputy Commissioner, plaintiff was 39 years old. She has a high school equivalency degree. She began working for the defendant PPG Industries in January 1989.
2. Plaintiff had an average weekly wage of $476.82 on March 9, 1993, yielding a compensation rate of $317.89 per week.
3. Plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant on March 9, 1993 while plaintiff was working on the conveyor. She was capping tubes on the conveyor and removing boxes of tubes. As plaintiff was pulling a box of tubes, it started to slide and the left corner of the box ripped out. Plaintiff rolled backwards and did a partial somersault, with her feet in the air. She landed, hitting her buttocks and lower back on the cement floor. She had tucked her head, and she rolled back forward.
4. Following her accident, plaintiff was seen on March 12, 1993 by Dr. Strader. He noted contusions on her low back and right buttock. At that time, plaintiff primarily complained of pain in the right buttock. X-rays of her spine and pelvis were negative for acute injury. Dr. Strader indicated she should take medicine for the pain and restricted her duties with no bending, stooping, squatting, reaching above shoulder level and lifting over 2 pounds.
5. Plaintiff continued to have back pain in the lumbar and sacral areas. She was treated with medication and on April 13, began physical therapy at Lexington Memorial Hospital. On her initial assessment for physical therapy, it was noted that plaintiff stood with a forward pelvic tilt, with her right knee flexed to keep her upright. Plaintiff was also given exercises to do at home, which she did. Although plaintiff continued her physical therapy through the end of June, it did not bring her relief. When she was discharged, the nurse noted that she continued to stand in a heavily forward flexed position.
6. Plaintiff continued to work on light duty from the date of her accident until the middle of June. After that plaintiff was given the option to take medical leave for up to 4 weeks at a time. She would work some light duty and then alternate to medical leave up until September 2, 1993.
7. On May 15, 1993, plaintiff had a spasm of pain in her lower back and was seen at the emergency room at Baptist Hospital in Winston-Salem. She was diagnosed with probable lumbosacral strain, and it was noted that she did have palpable paraspinal muscle spasms. Plaintiff was treated and discharged with her condition unchanged.
8. A CT scan done May 25, 1993 showed a mild symmetrical bulge of the annulus at L5-S1. Otherwise, the CT was normal for L3-4 through L5-S1.
9. Plaintiff was also seen by Dr. J. Keith Miller at Johnson Neurological Clinic on June 8, 1993. He felt that her pain was muscular in origin. He noted a lot of spasm from the lower thoracic region down into the area of the SI joints. He started her on Robaxin and also Doxepin, and wanted her to continue her exercises at home. He advised her to use Advil and Toradol as needed for pain.
10. About a month after her accident, plaintiff started to experience a mild spasm or jerking of her head and neck. Initially, it was like a minor twitch so that an observer might not notice. Plaintiff would sometimes turn her head and experience a jerk or tremor. These tremors would continue from a few minutes up to 30 minutes and then stop.
11. These tremors or spasms continued and became more pronounced until it became noticeable by late June or early July. Around late July, plaintiff reported to her workplace and the guard at the gate stopped her due to her noticeable tremors. He called her supervisor, Harold Tucker. Mr. Tucker told the guard to send plaintiff to the nurses station. Tucker met plaintiff at the nurses station and observed severe motion of her head from side to side. After observing her, Tucker told her to stay at the nurses station the entire shift.
12. On August 9, 1993, plaintiff was seen by Dr. Stewart at Johnson Neurological. Dr. Stewart noticed the tremors, particularly in her shoulders. He did not know the causes of these tremors and wanted her to return for evaluation by Dr. Miller.
13. Plaintiff was seen by Dr. Miller on August 10 and he also assessed a movement disorder and referred plaintiff to Dr. Francis Walker, a Professor of Neurology at the Bowman Gray School of Medicine. Dr. Walker noticed an unusual body jerking and it was his impression that plaintiff had a psychogenic tremor.
14. On her own, in August, 1993, plaintiff went to the Medical School at UNC-Chapel Hill. She was frustrated by Dr. Walker's impression that her tremors were of a psychogenic origin. At UNC she was seen by Dr. Imran Ali in the neurology department. Her neurological exam was normal and he referred her for a psychological evaluation.
15. Dr. L. Jarrett Barnhill, an Associate Professor of Psychiatry and Director of the Developmental Neuropharmacology Clinic evaluated plaintiff on October 13, 1993. Dr. Barnhill concluded that her movement disorder was not psychological in origin. His diagnosis was that she had a movement disorder of unspecified type, with predominant dystonic qualities. Dr. Barnhill noted that there are rare reports of post-traumatic dystonia. He recommended a course of Clonazepam and that she stay out of work for at least 2 to 3 weeks.
16. Plaintiff was referred for a second opinion to Dr. Stephen J. Reich, an Assistant Professor and Chief Resident in the Department of Neurology at Johns Hopkins University. Dr. Ali sent Dr. Reich a letter dated January 26, 1994 outlining the plaintiff's history and her evaluation at UNC Medical School. Dr. Reich is an expert on motion disorders. Of the approximately 1200 patients he sees each year, about two-thirds have motion disorders.
17. Dr. Reich saw plaintiff on or about February, 1994. He noted plaintiff had horizontal tremors of the head, and two types of involuntary movements of her mouth: jaw opening and puckering movements of her lips. He also noticed some trunk involvement, jerking and twisting motions of the upper trunk and that she had loud, somewhat grunting respirations, and difficulty speaking.
18. Dr. Reich concluded that plaintiff suffered from dystonia, a neurological condition. Dr. Reich diagnosed plaintiff with segmental dystonia, which involves several specific body regions. Dystonia is a neurological syndrome of involuntary muscle spasms frequently causing twisting movements or abnormal postures. Typically, dystonia begins gradually and insidiously and progresses slowly.
19. Although it has not been scientifically proven that trauma causes dystonia, Dr. Reich believes that most medical authorities on movement disorders would agree that in some cases there is a direct causal relationship between the two. Dr. Reich's has seen in his own practice and it has been substantiated in the literature, that there seems to be a close temporal relationship between trauma and the subsequent development of dystonia.
20. It is the opinion of Dr. Reich, to a reasonable degree of medical certainty, and the Full Commission finds as a fact, that the plaintiff's dystonia was caused by the trauma plaintiff suffered in her accident of March 9, 1993. Dr. Reich based this conclusion on clinical observation, the medical evidence itself, and the temporal association between the trauma and the subsequent development of dystonia. The plaintiff's jerking of her head which started within a month of the accident and was obvious by August, 1993, and her unusual forward-tilted posture noted in her medical records both were early signs of dystonia.
21. Dr. Reich anticipates, and the Full Commission so finds, that plaintiff's dystonia will be permanent, since almost all cases of dystonia in adulthood are permanent. He believes an appropriate course of treatment for plaintiff would be to try oral medications along with botulinum toxin injections which weaken the overall muscles. These treatments help reduce, but do not cure, the dystonia. Any other treatment for plaintiff would be more complicated because her head moves in several directions and a variety of postures. It is his opinion, and the Full Commission so finds, that, due to her dystonia, it would be very difficult for plaintiff to engage in any type of employment, especially factory work that would require hand and head coordination.
22. At the hearing before the Deputy Commissioner, the plaintiff's head, neck, and shoulders moved in what appeared to be an uncontrollable and involuntary fashion. Plaintiff also had a noticeable defect in her speech. Her voice modulates uncontrollably and her speech at times is slow and slurred.
23. Dr. Ali and Dr. Barnhill at UNC were the first physicians to diagnose plaintiff's movement disorder as one that was not of psychological origin, with dystonic qualities. Dr. Reich at Johns Hopkins gave a definite diagnosis for plaintiff's condition and formulated a treatment plan. The Full Commission finds that the evaluation and treatment rendered by these physicians was reasonably necessary.
24. Plaintiff was in and out of work during August, 1993. She was either on light duty or on medical leave of absence. On September 2, 1993, plaintiff was placed on long term disability. This disability plan was provided and funded by the defendant employer, with no contributions from plaintiff. Plaintiff received 39 weeks of benefits under this plan at $200 per week for a total of $7,800.
25. The greater weight of the medical evidence establishes that the plaintiff's injury by accident on March 9, 1993, caused the subsequent development of her dystonia, a movement disorder. As a result of her dystonia, plaintiff has been unable to engage in gainful employment at least since September 2, 1993.
* * * * * * * * * * *
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's accident of March 9, 1993 caused a lower and mid-back strain. The accident also caused the subsequent development of dystonia, a neurological condition which causes involuntary movement of plaintiff's head, neck and shoulders.
2. Defendant is responsible for payment of all medical expenses incurred to date by plaintiff as a result of the March 9, 1993 injury by accident, including the evaluation and treatment rendered by Dr. Ali and Dr. Barnhill, physicians at UNC and Dr. Reich and his colleagues at Johns Hopkins University. From this treatment they were able to diagnose the cause of her movement disorder and formulate a treatment plan.
3. Defendants are responsible for payment of all medical expenses to be incurred by plaintiff for ongoing treatment for her injuries incurred in the March 9, 1993 accident, including medication and treatment for her dystonia.
4. As a result of her dystonia, plaintiff has been temporarily totally disabled since September 2, 1993, and is entitled to compensation benefits at the rate of $317.89 per week from that date forward for so long as plaintiff remains unable to return to gainful employment or until further order of the Commission.
5. Defendant is entitled to a credit for the $7,800 paid in benefits to plaintiff under the long term disability plan funded by defendant.
* * * * * * * * * * *
Based on the foregoing findings of fact and conclusions of law the Full Commission affirms the holding of Deputy Commissioner Cramer and enters the following:
AWARD
1. Defendants shall pay all reasonable medical expenses incurred to date by plaintiff as a result of her compensable injury by accident, including diagnosis and treatment for her dystonia. This includes the medical services provided by Dr. Ali, and Dr. Barnhill at UNC Medical School and Dr. Reich at Johns Hopkins
2. Defendants shall continue to provide reasonable and necessary medical care for plaintiff in the future for her injuries sustained in the accident of March 9, 1993, including the dystonia.
3. Defendants shall pay plaintiff compensation at the rate of $317.89 per week from September 2, 1993 and continuing until such time as plaintiff is no longer disabled, returns to work, or until further order of the Commission. This amount shall be subject to a reduction for the $7,800 paid by defendant under the disability plan funded by defendant.
4. After a determination of the accrued compensation benefits due plaintiff, less the deduction of the offset for disability benefits already paid by defendant, an attorney's fee in the amount of twenty-five percent of the net compensation due and payable to plaintiff is approved for plaintiff's attorney. Thereafter, every fourth check due plaintiff shall be forwarded directly to plaintiff's attorney as an attorney's fee.
5. Defendant shall pay the costs.
 S/ ____________________________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/ ____________________________ BERNADINE S. BALLANCE COMMISSIONER
S/ ____________________________ COY M. VANCE COMMISSIONER